[Civil No. 4264. Filed January 13, 1941.]

[109 Pac. (2d) 41.]

CONSOLIDATED MOTORS, INC., a Corporation, Appellant, v. D. P. SKOUSEN; FERNE SKOUSEN, His Wife; HELEN STREITZ; HATTIE MOSHER; HATTIE MOSHER, Surviving Trustee Under the Last Will and Testament of JULIA A. LOUNT, Deceased; H. B. HUGHES; COIT I. HUGHES; COUNTY OF MARICOPA, a Municipal Corporation; CITY OF PHOENIX, a Municipal Corporation, Appellees.

Messrs. Snell & Strouss and Mr. Mark Wilmer, for Appellant.

Mr. E. R. Thurman, for Appellees D. P. Skousen, Ferne Skousen and Helen Streitz.

Mr. E. E. Selden, for Appellees Hattie Mosher, Hattie Mosher, surviving trustee, H. B. Hughes and Coit I. Hughes.

LOCKWOOD, C. J.—This is an action by Consolidated Motors Company, Inc., a corporation hereinafter called plaintiff, against D. P. Skousen and various other parties, hereinafter called defendants, to quiet

title to what is described in the complaint as lot 7 and the north one-half of lot 8, block 1 of Churchill's Addition to the City of Phoenix, Maricopa County, Arizona, the property also being described by metes and bounds. The principal defendants are D. P. Skousen and his wife, who claim to be the owners of the premises by reason of a certain foreclosure of mortgage and a tender of redemption of the property from taxes. Plaintiff relies for its title on two tax deeds, and the real question for our consideration is whether, in view of all the facts, the latter are valid. The trial court rendered judgment that plaintiff take nothing by its complaint and that the action be dismissed and defendants recover their costs.

The undisputed facts are as follows: The taxes on what was described in the records of the county assessor of Maricopa county as lots 7 and 8, block 1, Churchill's Addition to the City of Phoenix and which were assessed to one James Dean Collins, were, in September, 1931, delinquent for the last half of 1927, the last half of 1928, and the entire years of 1929 and 1930. The county attempted to sell them for these delinquencies, under the provisions of chapter 103 of the Session Laws of 1931, and certificates of sale therefor were issued to the state of Arizona on July 11, 1932. The certificate covering lot 8 was assigned to W. R. Wayland and Fred G. Holmes on July 30, 1938. The south half of this lot was redeemed by the record owner thereof, James Dean Collins, on July 30, 1938. At some time prior to December 23, 1938, Wayland and Holmes applied for a treasurer's deed to the north one-half of lot 8, which was issued to them on May 16, 1939. They then conveyed this north one-half to plaintiff. The certificate of purchase to lot 7 was assigned by the state to Dell E. Webb on May 19, 1939, and prior to June 2 of that year he applied for a trea-

surer's deed. On June 21, defendant Skousen tendered to the county treasurer the amount of taxes then due on lot 7, without any penalties or interest added thereto, which tender was refused by the treasurer. No further tender being made, a treasurer's deed was issued to Webb on July 5, and on September 12 he conveyed lot 7 to plaintiff.

There are four principal questions affecting the validity of plaintiff's title, and they may be stated as follows: (a) Was the tax sale of July 11, 1932, to the state of Arizona made in accordance with law? (b) Was the description of the property in the various instruments affecting the tax title sufficient? (c) Was the tender made by Skousen for the redemption of the north one-half of lot 8 a valid one? and (d) Did the treasurer have the right to issue a deed to Wayland and Holmes for one-half of lot 8 when the tax sale embraced the entire lot? We will consider these questions in their order.

We consider first the validity of the tax sale. It was made under the provisions of chapter 103, *supra,* and it is contended by defendants that the proof offered by plaintiff in the present action failed to show affirmatively certain jurisdictional prerequisites of a valid tax sale, in particular that it was not shown the following provision of section 18 of the chapter was complied with:

" . . . The said treasurer shall send, by letter mail, to the owner of each parcel of said property, if the owner be known, at his last known address, a copy of said notice of proposed sale. . . . "

The testimony on this point, in substance, was that it was the custom of the treasurer's office to make an original and carbon copy of the notice of sale required by section 18, *supra,* and mail the original to the reputed owner of the premises at his last-known address,

retaining the copy in the files of the office; that there was in such files a carbon copy of the notice of sale marked "James Dean Collins, care Hattie L. Mosher, 415 North First Street" and that the original of said notice was gone, but there was no specific affirmative testimony of anyone that such original had been mailed.

It is the general rule in matters of this kind, where it is the custom of a business office to follow a regular routine, that where it is affirmatively established that part of a routine was followed it is presumed, in the absence of some evidence to the contrary, that the rest was also followed. *Backdahl* v. *Grand Lodge,* 46 Minn. 61, 48 N. W. 454; *Smith* v. *F. W. Heitman Co.,* 44 Tex. Civ. App. 358, 98 S. W. 1074. We think this is particularly applicable to matters such as the mailing of routine letters in an office where a very large number of such letters are customarily mailed in the due course of its business, and that proof of the custom and the fact that a carbon copy was found without the original in the place and under the circumstances where it would have been found, if the original had been mailed, is sufficient, in the absence of evidence to the contrary, to support a finding that the original had been properly mailed. But even if the facts above stated are not sufficient evidence to establish the mailing of the letter, we think there is another principle applicable to the situation. It is the general and almost universally accepted rule that where a public officer is required as a condition precedent to the performance of an official act to do a certain thing, the presumption is that he has done it. 22 C. J. 131 and cases cited.

Defendants admit this general rule but claim that it does not apply to proceedings *ex parte* such as tax sales. Their position is supported by the greater

number of authorities. *Ronkendorff* v. *Taylor's Lessee,* 4 Pet. 349, 7 L. Ed. 882; *Keane* v. *Cannovan,* 21 Cal. 291, 82 Am. Dec. 738; *Huey* v. *Van Wie,* 23 Wis. 613. This court, however, is committed to a contrary rule. In the case of *Wallapai Mining Co.* v. *Territory,* 9 Ariz. 373, 84 Pac. 85, 87, an action was brought under the then existing statute for the purpose of collecting delinquent taxes on certain property. Therein we said:

" . . . It is further claimed that there is no evidence that the delinquent lists were properly returned and certified, or that the assessment was ever equalized by the board of supervisors, or that the law was complied with in other respects. . . . As to the second objection, in the absence of evidence to the contrary, the legal presumption attaches that the officers intrusted with those duties duly performed them."

It is true that the method for the collection of delinquent taxes at that time differed in many respects from that prescribed by chapter 103, *supra,* but the principle is the same. In the very recent case of *Conway* v. *Mosher,* 55 Ariz. 467, 103 Pac. (2d) 465, 466, the sale of property under chapter 103, *supra,* was involved, and it was contended the record failed to show that certain prerequisites of the chapter were complied with in the making of the sale. We said:

" . . . The record here does not show on what day the sale was made but we will assume the county treasurer performed his duty and did not sell the property to the state on the first day of the commencement of sales but on some subsequent day."

The attitude of the courts and legislatures towards tax sales has changed considerably of recent years. Under the early common law every presumption was against the validity of a tax sale, and it was necessary for one claiming under such a sale to prove to the uttermost detail a compliance with the provi-

sions of the statute. The effect of this was to make tax titles almost impossible to establish, and as a result the state was seriously hampered in the collection of the taxes due it. Many legislatures, therefore, including that of Arizona, have passed statutes relaxing the strict requirements of the common law in regard to proof of the validity of tax sales, and the modern tendency of the courts is to regard many provisions heretofore considered to be jurisdictional as merely directory. We are of the opinion that this tendency is a salutary one. The payment of taxes is absolutely essential to the maintenance of government, and it is and always has been recognized that it is the duty of every citizen to pay his fair share of such taxes, the only necessary limitations, in the absence of specific constitutional provisions, being that those in like circumstances shall bear like burdens, and that a reasonable opportunity shall be given to the citizen to be heard at every step imposing the tax burden upon him or his property. With these exceptions the power of the legislature in regard to taxation is practically plenary. We see no reason in either justice or logic why the general rule of evidence that a public officer is presumed to do his duty should not apply in regard to the details in tax proceedings in the same manner as to any other public act.

It is apparent, upon an examination of chapter 103, *supra,* that the notice contemplated by the legislature as giving jurisdiction to proceed with the tax sale, is the published notice provided for by section 18, *supra,* and not the notice by letter to the owner, for the statute expressly provides that the fact that a mistake is made in regard to the name of the real owner either in the assessment or the sale is immaterial so long as the notice specifically identifies the property and the amount of taxes. If, as frequently

happens, the property is assessed to the wrong party or an unknown owner, it would be impossible to give any mailed notice to the real owner, but that does not affect the jurisdiction to make the sale. The reason for this, of course, is that every owner of property knows that taxes must be paid thereon, and the duty is imposed upon him of watching the various tax proceedings to protect his interests. If he is given a reasonable time and place to do this, the mere fact that he does not actually have notice thereof does not invalidate tax proceedings. While it is true that one claiming under a tax deed bears the burden of proof to show that all of the essentials fixed by statute for the sale of the property were complied with, we think *prima facie* proof may be made by the presumption that the public officer has done his duty, in all cases where the statute does not either expressly or impliedly require a different method of establishing the particular fact involved. We hold, therefore, that regardless of the effect of the testimony in regard to the custom of the county treasurer's office, in the absence of some evidence to the contrary, it will be presumed that the notice required to be sent by mail to the reputed owner of the property was mailed.

The next question is as to the sufficiency of the description of the property. The notices of application for the deeds and the deeds themselves describe it respectively as "lot 7, block 1, Churchill's Addition to the City of Phoenix, Maricopa County, Arizona," and "the north one-half of lot 8, block 1, Churchill's Addition to the City of Phoenix, Maricopa County, Arizona." The complaint describes the property by metes and bounds and then adds: "such property being commonly known and referred to as lot seven (7) and the north one-half ($\frac{1}{2}$) of lot eight (8), block one (1) of Churchill's Addition to the City of Phoenix,

Maricopa County, Arizona.'' For the purpose of identifying this property, two maps were offered in evidence. One map is described as being recorded in the office of the recorder of Maricopa county in ''book 2 of maps at page 69'' thereof, and the photostatic copy of such map shows block 1 thereof with no subdivision whatever into lots. This plat is identified on its face as ''Churchill's Addition to the City of Phoenix, Maricopa County, Arizona Territory,'' and it is contended by defendants that the description in the deeds and in plaintiff's complaint ties the property claimed by plaintiff to this map, and this only, and that since therein no lots such as are described in the deeds and in the complaint appear, the description is insufficient. Plaintiff, to meet this, offered in evidence a certain map which is entitled ''Official City Map covering the Southeast Quarter of Section 5, T. 1 N., R. 3 E., which is hereby designated as Churchill,'' and proved that this was the map which had been used for the purpose of assessing the particular lots in question ever since the year 1920. In this map lots 7 and 8 appear in block 1, in accordance with the description in the complaint, and the uncontradicted evidence shows that these two lots were the ones which had been assessed and sold by the county. It appears upon a comparison of the two maps that they cover the identical ground, the only difference being, so far as lots 7 and 8 are concerned, that block 1 is subdivided into lots in the one map and not in the other.

Section 3084, Revised Code of 1928, which was carried forward from chapter 35 of the Third Special Session, Laws of 1913, reads as follows:

''*Assessor to prepare block maps.* The assessor shall also have prepared maps of the various blocks within any city or town or any addition thereto, of each surveyed township, and of the surveyed mines of each mining district, upon which maps he shall check

off the various subdivisions as they are assessed, and in each subdivision he shall mark the name of the person to whom it is assessed. Said maps shall be a permanent record of the county and the cost thereof shall be a county charge.''

Under this section it was proper for the assessor to assess the lots in question from this map, notwithstanding that the original map of Churchill's Addition, found in book 2 of maps in the recorder's office, showed block 1 not subdivided into lots, and we think that under the provisions of section 56, chapter 103, *supra,* the description was sufficient.

The next question is as to the sufficiency of the tender. This depends upon the construction given to chapter 62 of the Regular Session Laws of 1939. This reads, so far as material, as follows:

''Section 1. Sec. 2, chapter 46, Session Laws of 1937, regular session, as amended, is amended to read:

''Sec. 2. *Interest Exemption.* Except as otherwise provided in this section, all taxes levied against real and personal property which were delinquent on October 1, 1938, shall be exempt from all interest if paid on or before the first Monday in December, 1939. . . . The exemption of interest herein provided shall not apply to taxes on property sold to private parties *prior to the passage of this act,* for delinquent taxes. . . . '' (Italics ours.)

The act did not carry the emergency clause and, therefore, under article IV, part 1, section 1 (3), Constitution of Arizona, could not become operative until June 12, 1939. The assignment of the certificates of sale were made to Wayland, Holmes and Webb before the act in question became operative. The question, therefore, is whether the words ''prior to the passage of this act'' refer to the date when it was signed by the Governor or the date when it became effective.

We have been cited to the case of *Cordiner* v. *Dear,* 55 Wash. 479, 104 Pac. 780, 782, which holds

that under a constitutional provision practically identical with ours, when the act contains the words "from and after its passage," as affecting a certain event, it refers to the date of its approval by the Governor, and not to the date when it becomes effective. The decision, however, was a five to four one, and there was a vigorous dissenting opinion filed. On the other hand, the cases of *State* v. *Bentley,* 80 Kan. 227, 101 Pac. 1073, and *Harding* v. *People,* 10 Colo. 387, 15 Pac. 727, which states also had constitutional provisions very similar to ours in regard to the time when an act became operative, held that the words referred to the time when the act takes effect, and not to the time it is approved by the Governor. We think, in reason, the latter construction is the correct one. The former might, in many cases, lead to complications and to absurd situations. Suppose, for example, a tender is accepted on the theory of the Washington case, and just before the date the act becomes effective a referendum petition is filed against it and it is defeated by the people at the ensuing general election. Obviously the tender would not be good and it might be difficult to restore the parties to the *status quo.* One may not act with safety under the provisions of any act until he knows that it has become effective, especially if there is a question as to whether that event will ever occur. Since the sufficiency of the tender depends upon whether Wayland, Holmes and Webb had purchased the property before the right to tender less than the taxes with interest and penalty accrued, we hold that the tender was not a valid one.

 There remains the question as to whether when the property was sold as a complete lot, the county treasurer had the right to issue a deed to a part thereof. The record shows that before the deed was issued, the legal owner of the south one-half of the lot

redeemed that half, as he had a right to do. Section 42 of chapter 103, *supra,* reads as follows: '

"Any person owning an interest less than the whole in any real property, may redeem such interest by paying the proper proportionate part of the whole amount due, and shall receive a certificate of redemption for such interest in the manner herein provided."

The record shows that James Dean Collins, who redeemed this half of the lot, was entitled to do so under this section, and this being the case, obviously the treasurer could not deed to the purchaser property which had been redeemed. The only thing he could do was to issue a deed to the one-half lot on which no redemption had been made.

There are several other minor questions raised which we have considered but which we think it unnecessary to discuss. On the whole case, we are satisfied that the evidence showed the statute was substantially complied with and that the tax deeds issued by the county treasurer conveyed the property to Wayland, Holmes and Webb. There is no question that they validly conveyed their interest to plaintiff.

The judgment is reversed, and the case remanded with instructions to quiet title in plaintiff to lot 7 and the north one-half of lot 8, block 1, of Churchill's Addition, as described in the complaint.

McALISTER and ROSS, JJ., concur.