[Civil No. 4483.  Filed June 15, 1942.]

[126 Pac. (2d) 804.]

EUGENE F. SANGUINETTI, Trustee Under the Last Will and Testament of Lilah B. Sanguinetti, Deceased, Appellant, v. RAYMOND QUON and LILLIAN QUON, Husband and Wife, and RAYMOND QUON, Jr., Appellees.

Mr. Wm. H. Westover, for Appellant.

Mr. Joe L. Green, for Appellees.

LOCKWOOD, C. J.—Eugene F. Sanguinetti, trustee under the last will and testament of Lilah B. Sanguinetti, deceased, plaintiff, brought suit against Raymond Quon, Lillian Quon, his wife, and Raymond Quon, Jr., his son, defendants, to quiet title to lots 14 and 15, block 11, Gadsden, Arizona. Defendants answered, denying that plaintiff had any interest in the property, and alleging that Raymond Quon, Jr., was the owner thereof, and counter claimed, setting up the facts upon which they based the claim of ownership of Raymond

Quon, Jr., and asking that title to the property be quieted in him. The case was tried to the court without a jury, and judgment rendered quieting the title in defendant Raymond Quon, Jr., whereupon this appeal was taken.

The facts are not in dispute and may be stated as follows: Prior to 1933 it is agreed the title to the property was in the Yuma National Bank. The taxes thereon for 1933 had become delinquent, and in 1934 Yuma county sold the property for these delinquent taxes to the state of Arizona, and certificates of sale therefor were duly issued. In July, 1940, the board of supervisors directed the county treasurer to make final deeds on all unredeemed tax certificates, and on October 15, 1940 the property was deeded to the state of Arizona. Thereafter the board sold the property for the state to Raymond Quon, Jr., for the sum of $180, and a deed therefor was issued and recorded on January 27, 1941.

In the meantime, and in 1936, the property was purchased by Lilah B. Sanguinetti from the Yuma National Bank and she assumed possession thereof. A brick store building covered the entire width of both lots and extended back for about 100 feet. While there were three separate store rooms in the building, it was built and considered as one structure. These premises were occupied for sometime by a general merchandise store, owned and operated by E. F. Sanguinetti, but the building was later leased to Raymond Quon and the stock of merchandise therein sold to him. He continued in the general merchandise business for some years, paying a monthly rental, but when the property was sold, as above set forth, he purchased it for his son, a minor of about fourteen years, and when the deed was finally issued he refused to pay any further rent to plaintiff on the ground that the latter no longer owned the property.

Plaintiff and his wife were largely interested in Yuma county realty, and when Mrs. Sanguinetti purchased the property, they owned in one way or another about two hundred separate pieces of real estate. At that time taxpayers had been granted the privilege of paying past due taxes in ten equal installments, and they desired to take advantage of that privilege. In order to be sure that the payments were properly kept up, they did not trust entirely to their own knowledge and records or the legal notices sent out by the treasurer of Yuma county, but made a private arrangement with the latter to keep them notified as to the condition of their taxes, so that they might protect the title to their various properties.

The tax sale above referred to had been made while the title to the property was in the Yuma National Bank, and it was not until several years thereafter that Mrs. Sanguinetti secured her interest therein. Whether from this reason or from some other, the county treasurer never gave any special notice to the Sanguinettis as to the situation in regard to the tax sale and the various steps taken thereunder, and it was not until Quon refused to pay rent that they had any actual knowledge of the state of affairs.

At the trial in the lower court it was stipulated that the judgment depended upon whether the proceedings in the tax sale were regular and valid. If they were, the judgment would necessarily be in favor of Raymond Quon, Jr. If they were not, it would be in favor of plaintiff. The question then is whether these proceedings complied with our statutes governing a situation of this nature.

█ In the case of *Consolidated Motors* v. *Skousen*, 56 Ariz. 481, 109 Pac. (2d) 41, 44, 132 A. L. R. 1040, we had occasion to discuss the general principles applying to the construction of statutes regulating tax sales, and stated:

"The attitude of the courts and legislatures towards tax sales has changed considerably of recent years. Under the early common law every presumption was against the validity of a tax sale, and it was necessary for one claiming under such a sale to prove to the uttermost detail a compliance with the provisions of the statute. The effect of this was to make tax titles almost impossible to establish, and as a result the state was seriously hampered in the collection of the taxes due it. Many legislatures, therefore, including that of Arizona, have passed statutes relaxing the strict requirements of the common law in regard to proof of the validity of tax sales, and the modern tendency of the courts is to regard many provisions heretofore considered to be jurisdictional as merely directory. We are of the opinion that this tendency is a salutary one. . . . "

We reaffirm the general principle thus stated. After all, the tax lien of the state is, in substance, merely a mortgage securing a debt to the state, and we see no reason why proceedings to enforce the mortgage lien of the state should be construed with more particularity than proceedings to enforce any other mortgage. If the statutory requirements are substantially complied with so that no real injustice is done the property owner and taxpayer, a mere failure to comply with the strict letter of the law should not necessarily invalidate the entire proceedings. With these general principles to guide us, let us examine the record to determine whether there was a substantial, if not a literal, compliance with the law.

There is no contention that the levy of the tax upon the property in question was not made in accordance with law, or that in 1934 the taxes were not delinquent and the property subject to sale therefor. At that time the sale of property for delinquent taxes was regulated by chapter 103 of the Session Laws of 1931. Section 18 thereof reads, so far as material to this case, as follows:

" . . . The county treasurer shall prepare a list of all real property upon which the taxes are unpaid and delinquent, describing such real estate as the same is described on the tax roll, with an accompanying notice stating that so much of each tract of real property as may by him be deemed necessary for the purpose will, on a day specified, and succeeding days, be sold by him at public auction at the county treasurer's office, for the taxes, penalties, interest and charges thereon, and taxes, penalties, interest and charges assessed against the owner thereof for personal property. . . .

"The county treasurer shall cause said list and notice to be published in two consecutive weekly issues of *a newspaper which has been designated by the board of supervisors as the official paper of the county,* the first of which publications shall not be less than two weeks nor more than three weeks prior to the day of sale prescribed therein, . . . " (Italics ours.)

It is admitted by plaintiff that every step required by the statute for the original sale of the property was fully complied with, except it is contended that the publication of the notice of sale above set forth as being required was not properly made, in that it was not made in "a newspaper which has been designated by the board of supervisors as the official paper of the county," and was published only twice in a daily, instead of a weekly paper. The record on this point shows the following facts: At the time of sale chapter 75 of the Session Laws of 1933 contained the following provision in regard to advertising and printing of all matters required to be done by counties:

"Section 1. Section 778, Revised Code of 1928, is hereby amended to read as follows:

"Sec. 778. *Advertising and printing by annual contract.* The board of supervisors shall let all advertising, publications and printing required or authorized to be done or made by them, by contract annually. Written notices of the letting of such contract shall be deposited in the post office by the clerk of the board, postage prepaid, addressed to the office of each quali-

fied newspaper within the county, at least ten days prior to the opening of bids, calling for written bids for the advertising and publications to be done or made by the county during the ensuing year, and stating on what day the bids received will be opened. The contract shall be made with the lowest and best bidder, in the discretion of the board, and to a newspaper which for at least one year has been admitted to the United States mail, as second class matter, under the act of Congress approved March 3, 1879, and whose bid is within the legal rate; and to such contractor shall be given, during the existence of the contract, all advertising and publications ordered by the board, upon the terms and conditions of such contract. The newspaper having such advertising contract may be referred to as the official newspaper of the county."

In the summer of 1934 written notices were mailed to the office of each qualified newspaper within the county, as required by the section. On July 17, the board of supervisors met for the purpose of considering the bids submitted. Among these was the following, the material part of which reads:

"The Sun Printing Company, a corporation, doing business in Yuma, County of Yuma, State of Arizona, and the publisher of The Yuma Sun, a weekly newspaper, published on Friday of each week, submits the following bid. . . .

"An affidavit of W. L. Odett, Vice-President of the Sun Printing Company, and manager of The Yuma Morning Sun and the Yuma Sun (Weekly) accompanies this bid or proposal and is attached thereto and made a part hereof, . . . "

This affidavit is in the following language:

"This affiant, W. L. Odett, states that he is the Manager of The Yuma Morning Sun and Yuma Sun, and the Vice-President of the Sun Printing Company; that said Yuma Morning Sun is published daily except Monday, and the said Yuma Sun published every Friday, and that each of the said papers are papers of general circulation in the State of Arizona, and the County

of Yuma, and that each of said papers have been published continuously in the said County and State for a period of more than one year."

Thereafter the following contract was made:

"This agreement, made and entered into this 19th day of July, 1934, by and between The Sun Printing Company, Incorporated, publishers of The Yuma Morning Sun, the party of the first part, and the County of Yuma, by its Board of Supervisors, party of the second part.

"(Terms of contract and performance bond follows, with signatures of contracting parties.)"

and a bond executed, the material parts of which are as follows:

"Know All Men By These Presents:

"That we, The Yuma Morning Sun, of Yuma, Arizona, as Principal, and the Fidelity & Deposit Company of Maryland, . . . are held and firmly bound unto Yuma County, Arizona, as obligee, in the penal sum of One Thousand and No/100 Dollars ($1,000.00), . . .

"The Condition of this obligation is such that, whereas, the above bounden Yuma Morning Sun entered into a contract dated July 1st, 1934, with the said Yuma County, Arizona, by the terms and conditions of which said contract Yuma Morning Sun agreed to print and publish the legal notices, minutes and other proceedings of Yuma County, Arizona, as described in said contract, copy of which is hereto attached, for a period of one year."

Notice of sale for delinquent taxes for the property concerned was published in the Yuma Morning Sun on October 6 and 13, 1934. The objection made by plaintiff is that the board of supervisors did not comply with the statute above quoted in regard to designating a newspaper in which the legal proceedings of the county should be printed, in that the bid was made, if at all, by the Yuma Weekly Sun, and that it was

the official newspaper of the county if, indeed, there was any official paper at all.

Let us examine this contention in the light of the statute. The statute requires notices to be addressed to the office of each qualified newspaper in the county, but it does not say that the contract can be awarded only to a newspaper which was formally notified of the bidding. It is urged that the statute says the contract should be made "with a newspaper" and it follows that only a "newspaper" can bid thereon. We think this is a forced construction, and, indeed, an impossibility. In the vast majority of cases "newspapers" are not legal entities, capable of entering into a contract. They are merely products owned either by an individual, a partnership or a corporation, and the name of the owner may have no relation whatever to the name of the newspaper owned. It is obvious from the record that neither the "Yuma Morning Sun" nor the "Yuma Weekly Sun" could possibly have entered into a legal and binding contract, for no such legal entities existed. There was a legal entity, the Sun Printing Company, a corporation, which owned two separate newspapers, both of which complied with the law so far as being newspapers in which legal notices could be lawfully printed. The bid was made by the Sun Printing Company. It was described in the bid as the publisher of the Yuma Sun, a weekly newspaper, but it was also described in the affidavit, which was a part of the bid, as the owner of the Yuma Morning Sun and the Yuma Weekly Sun, and each of the papers was fully qualified to publish legal notices for Yuma county.

The matter culminated in a contract between the county and the Sun Printing Company. This contract described the company as the publisher of the Yuma Morning Sun, without reference to the Weekly

Sun. The bond accompanying the contract describes the Yuma·Morning Sun as the principal and states that the Yuma Morning Sun had entered into the contract to print and publish legal notices. We think any reasonable man, reading all the record, would be convinced that the Yuma Morning Sun, and not the Yuma Weekly Sun, was the paper in which the Sun Printing Company, which had received the contract for county printing, expected and intended to publish legal notices, and that any citizen who desired to ascertain in what paper he should look for legal notices would have been advised that it was in the Yuma Morning Sun. If the Sun Printing Company had sued Yuma county for printing public notices at an agreed price in the Morning Sun, and the county had defended on the sole ground that the notice should have been printed in the Weekly Sun, rather than the Morning Sun, we are sure that any court would have rendered judgment in favor of the printing company on the ground that the contract called for printing in the Morning Sun. It is true there was no resolution of the supervisors expressly designating the Morning Sun as the official county paper, but the statute providing for awarding the county printing does not require such a designation, as did the Minnesota statute referred to in such cases as *Eastman* v. *Linn,* 26 Minn. 215, 2 N. W. 693; *Foster* v. *Gage,* 117 Minn. 499, 136 N. W. 299, but states the newspaper in which the printing is to be done ''may be referred to as the official newspaper of the county.'' This, we think, is equivalent to a statutory designation of the ''official paper'' of the county referred to in section 18, *supra.* But even in Minnesota, in the case of *Fairchild* v. *City of St. Paul,* 46 Minn. 540, 49 N. W. 325, 327, on a state of facts very analogous in principle, though not in detail, to those of the present case, the court said:

" . . . Considering that the main object of designating an official paper is to advise parties in what paper to look for notices affecting their property, it seems to us, in view of all the facts, that any one examining the resolution of the city council would have readily understood what paper was referred to, and consequently that the designation fully satisfied the requirements of the charter."

and upheld the publication. We think the Yuma Morning Sun was the newspaper in which publication of the notice of tax sale was required to be made.

There is also objection made that the statute requires the publication of notice of sale of delinquent property in a "weekly" newspaper. This is not true. The language is "in two consecutive weekly issues of a newspaper," which is a very different thing. When publication of a legal notice is required to be made for *a certain length of time,* then it must be published six days out of seven in each week of the specified time, if publication is made in a daily newspaper. Section 2747, Revised Code 1928 (18–104, Arizona Code 1939). But where the statute requires merely a specified *number of publications,* then that rule is what must be followed, regardless of how many issues of the paper appear in a given time. The record shows that the statute was literally complied with in this respect, publications being made on the 6th and 13th days of the month. See *McLoughlin* v. *City of Prescott,* 39 Ariz. 286, 6 Pac. (2d) 50. We hold, therefore, that the statute in regard to the publishing of notices of delinquent tax sales was substantially complied with.

The next objection which we consider is the notice of giving of a deed to the state of Arizona. It is objected that in the notice a demand was made for redemption of both pieces of property as one, while the property had been assessed and sold as two separate lots. The statutes governing the issuance of deeds are

73–835 and 73–836, Arizona Code 1939, which read as follows:

*"Treasurer's deed.*—If any real property, at any time after the expiration of five (5) years from the sale thereof for delinquent taxes, be not redeemed from such sale, the purchaser, or his assigns, including the state of Arizona, may, at his option, instead of filing suit as hereinabove provided, receive a treasurer's deed to such property on compliance with the two following sections. The county treasurer, on demand of any such purchaser, shall cause to be published in two (2) consecutive weekly issues of the official newspaper of the county, a notice that the purchaser, or his assignee, has applied for a treasurer's deed, and that unless the property be redeemed before the date specified therein, a treasurer's deed will issue to such purchaser, or his assigns."

*"Notice of application for treasurer's deed.—Fee.*— The date specified in any such notice shall be not less than thirty (30) days from the date of the first publication thereof, and such notice shall state the description of the property and the amount for which it was sold, together with the date of such sale and the name of the owner of such property, if known. Such notice may be in the following form:

## "TREASURER'S OFFICE

"———— County, State of Arizona.

"Notice is hereby given that ———— has applied for a treasurer's deed to the following described property, owned by ———— and situated in ———— County, State of Arizona:

(Description)

which, on the ———— day of ————, 193—, was sold to ———— for taxes, interest, penalties and charges amounting to ———— dollars and ———— cents. If redemption according to law be not made before the ———— day of ————, 193—, I will convey said premises to such applicant or his assigns."

The notice, as published, was in the following language:

"Treasurer's office, Yuma County, Arizona,
September 13, 1940.

"Notice is hereby given that State of Arizona has applied for a Treasurer's deed to the following described real property owned by Lilah B. Sanguinetti, Yuma National Bank and situated in Yuma County, Arizona: Lot 14, Block 11, Gadsden; Lot 15, Block 11, Gadsden, which on the 15th day of December, 1934 was sold to State of Arizona for taxes, interest, penalties and charges amounting to fifty-four Dollars and eighty-six cents as represented in Tax State Certificates No. 13883–13884.

"If redemption according to law be not made before the 16th day of October, 1940, I will convey said premises to such applicant or his assigns.

"R. C. GEORGE
"Treasurer of Yuma County, Arizona."

It is urged that the lots were sold separately by certificates numbers 13883–884, in one case for $50.53 and in the other for $4.33; that while the lots might have been assessed as one parcel and sold in that manner, since they had been assessed and sold as separate parcels, the owner was entitled to redeem them separately. This is undoubtedly true, but it does not follow that it was erroneous for the notice to state in a lump sum the amount for which the two lots were sold. The notice, on its face, listed the two lots separately and stated that two certificates had been issued therefor. It did not state that it was necessary to redeem the two lots as one, but merely that "if redemption according to law" was not made the property would be deeded. We think that this was a strict compliance with the law and gave notice to the owner of the property that a deed had been asked for; that the lots had been sold under two certificates; that the sum of the two certificates was $54.86, and that he could redeem according to law, which of course meant either lot separately for the amount shown by its certificate of sale. Had the notice stated that the amount due

under *both* certificates must be paid to redeem either lot, or had it appeared that the owner offered to redeem separately and was refused the privilege, a very different situation would have arisen. The notice of application for deed was substantially in compliance with the law.

The last point raised is that the plaintiff and his predecessor in interest had relied upon an agreement with the treasurer to notify him as to the condition of the taxes, and that the treasurer had failed to do so. We are not cited to any provision of law imposing a duty of this nature upon the treasurer. The situation, we think, is the same in principle as that appearing in the case of *Weidler* v. *Arizona Power Co.*, 39 Ariz. 390, 7 Pac. (2d) 241, where the treasurer, as a matter of courtesy to friends, had agreed to perform certain services not required by law, and where we held that the rights of the county and the state could not be affected by the failure of the treasurer to carry out his private agreement. Certainly a promise by the treasurer to do something which the law did not require him to do cannot in any manner affect the rights of the county and state. Nor can the claim be made, as was successfully made in the case of *Eckert* v. *Miller*, 57 Ariz. 94, 111 Pac. (2d) 60, that defendants were guilty of any fraud or illegal conduct in the transaction. It is true that they were tenants of plaintiff, but, as we held in the case just cited, under the modern law a tenant who does not occupy a special fiduciary relation in regard to the premises is not prohibited from buying in a tax title. There is not the slightest suggestion that defendants in any manner were guilty of any breach of a duty towards plaintiff. The property had been sold for taxes long before they leased it. They had taken no part whatever in the proceeding by the state to secure the deed, so far as the record

shows, and, indeed, had nothing to do with the matter until the property was offered for sale by the state. They then appeared and made a bid which was accepted. This was fully within their rights, and the mere fact that they succeeded in thus obtaining a valuable piece of property for a very low price does not affect the legality of the proceeding.

The judgment of the lower court is affirmed.

McALISTER and ROSS, JJ., concur.