METROPOLITAN LIFE INSURANCE COMPANY, Interstate Life and Accident Insurance Company, Fidelity Mutual Life Insurance Company and Jefferson Standard Life Insurance Company, Petitioners,

v.

Christine SMITH, Individually and Co-Executor of the Estate of Dr. Doyle J. Smith, Deceased, et al., Respondents.

Supreme Court of Tennessee.

Aug. 1, 1977.

Dale Woodall, G. Wynn Smith, Robert M. Johnson, Susan Callison, Memphis, for petitioners; Canada, Russell & Turner, Cobb, Edwards, Hamlet, Nichol & Woodall, Memphis, of counsel.

D. Jack Smith, Jr., J. N. Raines, Lucius E. Burch, Memphis, for respondents; Dann, Blackburn, Smith & Goldin, Burch, Porter & Johnson, Memphis, of counsel.

OPINION

HARBISON, Justice.

Respondents sued four life insurance companies seeking double indemnity benefits for the alleged accidental death of the insured, Dr. Doyle J. Smith. The ordinary

life benefits under each policy have been paid.

Respondents demanded a jury, but at the conclusion of their evidence in chief, the trial judge directed a verdict for the insurance carriers. The Court of Appeals reversed and remanded for a new trial, and this Court granted certiorari.

Although the Court of Appeals considered that legal questions were presented as to the interpretation of the policy provisions, we regard the issue primarily as one of the sufficiency of the evidence. The case presents a frequently litigated fact situation, where an insured suffering from an advanced disease sustains accidental injury by trauma and thereafter dies.[1] The policies provide double indemnity for death resulting from accidental means, exclusive of all other causes and independently of pre-existing disease.

There is no serious dispute about the known facts, nor have conflicting expert opinions been offered. The only question is whether a submissible jury issue was presented.

The insured, Dr. Doyle J. Smith, was 58 years of age at the time of his death. He had been actively engaged in Memphis as an orthodontist for many years. In 1961 he suffered a myocardial infarction and continued intermittently to have chest pains for the remainder of his life. He resumed his professional and other business activities after about four weeks, however, and was not again hospitalized for suspected heart disease until December 29, 1971. At that time he was complaining of chest pains and he remained hospitalized until January 8, 1972. Extensive tests were made in the hospital, and his attending physician testified that there was no evidence of a recent or further myocardial infarction. He concluded that Dr. Smith probably suffered from coronary insufficiency or from a hiatal hernia. The insured was discharged on medications designed to relieve either condition, including nitroglycerin and anticoagulants.

Dr. Smith returned to the practice of his profession for the next two weeks. He was seen twice in that period by his physician for chest pain, and again the doctor felt that this was due either to coronary insufficiency or to hiatal hernia.

On the evening of Sunday, January 23, 1972, Dr. Smith sustained a traumatic injury to his head while he was in or near his office. His wife testified that he had left his home on Sunday afternoon to visit his mother and was then planning to go to his office, as he frequently did. She did not hear from him again until very late on Sunday evening, when he returned home after midnight. Mrs. Smith had no discussion with him on that evening concerning any injury. When his business manager, Mrs. Nelson, opened the office early on Monday, January 24, 1972, however, she discovered blood in and around his office and washroom. Later Dr. Smith told her that he had fallen and struck his head on a credenza behind his desk. During the week he made statements to other persons that he had been hit over the head, and on the evening of Friday, January 28, 1972 he stated to a witness that he had been struck in the parking lot. Dr. Smith thought that some boys who frequented the area had probably attacked him, but he made no complaint to the police, nor was any official investigation made of the incident until after his death.

Dr. Smith worked in his office on Monday, January 24 and during the next two days. He remained at home on Thursday but came to his office on Friday. He was seeing patients during the week, but he frequently complained of headache. On Wednesday night, he called the office of his doctor to ask for medication for relief of head and neck pain. A remedy was prescribed by telephone. On Friday he sent to his physician's office for some medication for headache. Dr. Smith did not actually see a physician after his head injury until he was carried to the emergency room of

1. *See generally* 1A, Appleman, Insurance Law and Practice § 403 (1965); 10 Couch, Insurance § 41:380 (2d ed. 1962); Annot. 84 A.L.R.2d 176 (1962); 82 A.L.R.2d 611 (1962).

the hospital late on the evening of Friday, January 28. At that time he was complaining of neck pain and severe chest pains. He was placed in the coronary care unit and treated during the next day for congestive heart failure. His attending physician did not examine his head or attempt to determine the extent of the head injury, apparently, until late on Saturday evening. Because the patient's condition steadily deteriorated during the evening of January 29, his physician concluded that he could be suffering from internal bleeding or from increased intracranial pressure. He sought consultation from a neurosurgeon, but before an arteriogram could be made, the patient died.

At autopsy, Dr. Smith was found to be suffering from severe, advanced arteriosclerosis, to such an extent that one coronary artery was totally blocked and the other had sixty to eighty per cent blockage. The autopsy also revealed that the patient had "mild to moderate" subarachnoid hemorrhage in the occipital area, due to the accident which had occurred on January 23. There was also a laceration and hemorrhaging into the skin of the scalp.

There were objections at the trial to some of the lay testimony, but questions of admissibility are not presented on this appeal. It is not contended that the lay evidence alone established a prima facie case, under the policy provisions. As in most cases of this nature, the cause of death and the relationship between death, the accident and pre-existing disease had to be established by expert testimony.

The only expert witness who testified was the attending physician, Dr. George Nichopoulos. He was examined at length by counsel for all parties. His professional opinion was that the traumatic injury sustained by Dr. Smith on January 23 was the "predominant cause of death," but throughout his testimony he stated that the advanced coronary artery disease was also a causative factor in producing death. He testified that a combination of the traumatic injury and the underlying disease produced death and that in his opinion neither, acting without the other, would have been fatal.

In response to questions by counsel for the insurance companies, Dr. Nichopoulos testified that the coronary artery disease and myocardial fibrosis from which the insured was suffering "contributed directly" to his death and that he presumed that without these pre-existing diseases, Dr. Smith probably would not have died. He further testified that the diseases from which Dr. Smith was suffering "indirectly" caused his death. In response to questions by counsel for the respondents, on redirect examination, Dr. Nichopoulos testified that the pre-existing disease played a "less than concurrent" role in his death, but "between secondary and concomitant, somewhere in there." [2]

The insured expired from congestive heart failure, resulting from a build-up of fluid or blood in the lungs. Dr. Nichopoulos testified that the head injury, through either pain or internal bleeding, could have triggered or set in motion this congestive heart failure. However, he testified that the advanced arteriosclerosis in the coronary arteries was the "main thing", from the standpoint of underlying disease, which contributed to the congestion. The autopsy revealed that the patient was suffering from a number of other chronic conditions or diseases, such as gout and a liver disease, but it is not contended that any of these conditions actively caused or contributed immediately to his death.

2. As exhibits to the doctor's deposition, there were introduced the death certificate, medical records and the autopsy reports. In all of these it was stated that there was a recent myocardial infarction, but Dr. Nichopoulos testified that this was not borne out, in his opinion, by the microscopic findings of the pathologist. He nevertheless included it in all of his reports to the insurance companies. The postmortem protocol listed "Coronary artery disease, severe," as a "primary diagnosis," and the head injuries as one of several "secondary" diagnoses. Dr. Nichopoulos disagreed only in that he thought the head injury should be in the "primary" category. Primary diagnoses, he said, are those "directly related to the cause of death."

In reviewing the record, the Court of Appeals concluded that "there was testimony from which a finder of fact could have found that pre-existing diseases did contribute in some degree to the death of Dr. Smith."

■ Our review not only confirms this conclusion, but we are unable to find any material evidence from which a finder of fact could conclude that the pre-existing diseases did not contribute in an active and measurable degree to the death, or that death would have occurred had the coronary artery disease not been a substantial causative factor. Under these circumstances, we are of the opinion that the insurance carriers are not liable under the terms of their contracts.

Unlike policies of ordinary life insurance, the terms and conditions under which an insurance carrier is obligated to pay "additional benefits in the event of death by accident or accidental means" may be specifically limited. T.C.A. § 56–1112(e). For a relatively small premium, in addition to the ordinary life rate, each of the policies in the present case required the carrier to pay double indemnity upon proof that the death of the insured occurred from bodily injury as the result "directly and independently of all other causes" of "external, violent and accidental means." Each of the policies further limited the risks assumed by specifically excluding death resulting directly or indirectly from a number of different causes, such as the commission of a felony, suicide, and unscheduled travel by aircraft. Each policy also provided that double indemnity would not be payable if death resulted directly or indirectly from illness or disease of any kind.

These provisions are standard, and have been used in double indemnity riders for many years. Necessarily they are expressed in general terms, and the fact situations to which they may have application are myriad.

The parties suggest in their briefs that the Tennessee courts have not been consistent in their construction and application of such policy provisions, and it is suggested that there are at least two different lines of authority, or two different approaches, found in the reported cases in this state. The Court of Appeals further stated that there had never been a case in this state construing the "exclusionary language" of the double indemnity riders, pertaining to illness or disease, as against the "coverage" clauses providing benefits for death by accidental means.

An examination of the decisions in this and other states does, indeed, reflect divergent results in a number of cases, but in almost every instance the opinion deals with the evidence contained in the particular record. In most of the cases, the court has been concerned either with the sufficiency of evidence to make a submissible jury issue or with jury instructions which were granted or denied.

The Court of Appeals placed great emphasis upon the decision of the Court of Appeals for the Sixth Circuit in the case of *Ore v. Aetna Life Ins. Co.*, 435 F.2d 957 (6th Cir. 1970). In that case, however, the appellate court was concerned exclusively with jury instructions given in the trial court. As to the evidence, the opinion states:

"The proof at trial was in conflict. Numerous medical experts testified as to the cause of death and their conclusions were at variance." 435 F.2d at 958.

This has been true in a number of other cases, where issues were submitted for jury determination upon conflicting expert medical evidence.

One of the cases most relied upon by respondents is *North American Ins. Co. v. Ellison*, 37 Tenn.App. 546, 267 S.W.2d 115 (1954). There a jury verdict had been returned in favor of the beneficiary, upon testimony by the attending physician that the cause of death was a massive pulmonary edema, or filling of the lungs with fluid. He felt that this resulted from a blood clot due to inactivity of the elderly insured who had been hospitalized following a fall in which her ankle was fractured. There was conflicting medical testimony,

particularly from a pathologist, who failed to find such a blood clot upon autopsy. The insurer insisted that death was due to hardening of the arteries and other natural causes. The Court of Appeals held, quite properly, that there was a jury issue as to whether the attending physician or the pathologist was correct. The Court stated that if a pre-existing disease or other infirmity is present merely as a "predisposing infirmity" and is not a primary or active cause of death, then there still may be recovery if trauma or accident can be shown to be "the efficient and predominating" or "proximate" cause. It noted as being "a correct statement of the law" a proposed instruction that there could be no recovery if disease "actively contributes to the death of the insured." 37 Tenn.App. at 554, 267 S.W.2d at 118.

In that case, the Court reviewed earlier decisions in which recovery had been denied, particularly *Wheelock v. Provident Life & Accident Co.*, 10 Tenn.App. 184 (1929), and *Provident Life & Accident Insurance Co. v. Campbell*, 18 Tenn.App. 452, 79 S.W.2d 292 (1935).

All of these cases were discussed by this Court in the case of *Britton v. Prudential Ins. Co. of America*, 205 Tenn. 726, 330 S.W.2d 326 (1959), in which the Court sustained a directed verdict for the insurance carrier. In that case the policy contained provisions similar to those involved in the present case, including an exclusionary clause for death resulting directly or indirectly from bodily or mental infirmity or disease in any form. Reviewing the medical testimony, the Court stated that even the physicians testifying for the insured found advanced arteriosclerosis to be a causative, operative factor in producing an acute coronary thrombosis. The Court found that the "strongest statement" in favor of the insured was testimony of one of the physicians that the accident only

"indirectly" brought about the thrombosis and was "a contributing cause" to his death.

In the later case of *Fireman's Fund Ins. Co. v. Glanton*, 224 Tenn. 213, 452 S.W.2d 861 (1970), the Court upheld a jury verdict where the insured sustained injuries and was hospitalized following an automobile accident. He was suffering from pre-existing arteriosclerotic heart disease. His attending physician testified that the accidental injuries "caused his blood pressure to drop and that he went into shock that precipitated the development of a clot which caused the heart to stop functioning." 224 Tenn. at 217, 452 S.W.2d at 863. The Court held that the testimony of the physician was "substantial and credible," and that a jury issue was presented as to whether death did result from the accident, directly and independently of all other causes. It did not discuss the effect of the heart disease except to say that it was "serious" and that without it the insured "might not" have died from the accident. It distinguished *Britton* on the facts, not upon any rule of law, and simply concluded that the record contained material evidence to support a jury verdict.[3]

We do not regard these cases as being legally inconsistent, or as necessarily presenting different or conflicting approaches to the problem at hand. Unfortunately, we cannot, as the parties ask in their briefs, lay down rules or "tests" which will lead infallibly to a solution of the difficult and complex problems which arise in this area. Necessarily each of the cases depends upon the facts and circumstances shown in the evidence, particularly the medical opinions, which are not always consistent or harmonious.

■ The companies do not insist, nor would the courts sustain an insistence, that the mere fact an insured is suffering from a disease automatically, in and of itself, pre-

---

**3.** For other cases dealing with sufficiency of the evidence in accidental death-disease claims, see *National Life & Accident Ins. Co. v. Follett*, 168 Tenn. 647, 80 S.W.2d 92 (1935) (jury issue on conflicting medical testimony); *Hughes v. Kentucky Central Life Ins. Co.*, 500 S.W.2d 442 (Tenn.App.1973) (jury issue on lay testimony and conflicting death certificates); *Reserve Life Ins. Co. v. Whittemore*, 59 Tenn.App. 495, 442 S.W.2d 266 (1969) (evidence insufficient to eliminate preexisting disease as causative factor).

cludes recovery of double indemnity benefits. Obviously, a cancer-ridden patient may still ride in a scheduled airliner and be killed when it crashes, independently of any other cause or of the operation of his disease. On the other hand, if such a patient falls and dies after he sustains an injury which ordinarily would not be fatal, then a difficult question may be presented as to the degree and extent, if any, to which death resulted from the fall or from the disease. The issue is usually resolved by medical testimony, and, if there is conflicting expert opinion, a jury issue may well exist.

As stated previously, we are not concerned in the present case with the nature or type of instructions which should be given to the jury or with rules as to burden of proof, except in the narrow sense of determining whether or not respondents made a prima facie case for determination by a jury.

Unlike the Court of Appeals, we are unable to conclude that the "exclusionary" language of the present policies should not be applied as written.[4] We agree with that Court that in many situations such clauses may be redundant, and may add little, if anything, to the basic terms and provisions of the "coverage" clauses. Again, this depends upon the facts. Exclusionary terms in particular circumstances may refine or limit coverage, such as those exclusions dealing with the commission of a felony or an unscheduled plane flight.[5] In the present case, the language of the exclusionary clauses makes clear the intention of the insurers, if such intention was not already manifest in the words "directly and independently of all other causes", that the carriers do not contract to provide double indemnity if it requires an active combination of a pre-existing disease and an accidental injury to produce death. The only professional opinion offered here was that

such a combination was necessary and did in fact occur. It simply did not eliminate the advanced arteriosclerotic disease as a causative and material factor in the death of the insured, or leave conflicting permissible inferences in that regard.

In our opinion, the trial court reached the correct result, and petitioners were entitled to a directed verdict on the trial record. The judgment of the Court of Appeals is reversed, and the judgment of the trial court is reinstated at the cost of the respondents.

COOPER, C. J., and FONES, HENRY and BROCK, JJ., concur.

---

4. See *Gilmore v. Continental Cas. Co.*, 188 Tenn. 588, 591, 221 S.W.2d 814, 815 (1949) (if policy provisions are clear, "there is no judicial duty but to give the language its usual and ordinary meaning.")

5. The Jefferson Standard policy in the instant case excluded death resulting from homicide. Although this was raised as a defense, the record clearly does not justify a directed verdict for the insurer under that exclusion, and the trial court did not so hold.