John QUINTANA, et al.,
Plaintiffs/Appellees,

v.

TENNESSEE FARMERS MUTUAL
INSURANCE COMPANY,
Defendant/Appellant.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

June 1, 1989.

Permission to Appeal Denied by Supreme
Court Aug. 7, 1989.

Arthur E. McClellan, Gallatin, for defendant/appellant.

Gregory M. O'Neal, Winchester, for plaintiffs/appellees.

## OPINION

KOCH, Judge.

This appeal involves a dispute concerning the insurance coverage on a house damaged by arson while its owners were out of town. The owners sued their insurance company in the Chancery Court for Coffee County seeking actual and bad faith damages. Following a bench trial, the trial court held that the house was insured at the time of fire and awarded the plaintiffs $26,865.07 in actual damages. The insurance company has appealed, insisting that it was not liable for the loss because it had effectively cancelled the insurance policy prior to the time of the fire. We agree with the insurance company and, therefore, reverse the trial court's judgment.

### I.

John and Ida Quintana purchased a farm on Lambert Ridge Road near Manchester in 1964, two years after Mr. Quintana retired from the Air Force. Their original frame house was destroyed by fire in December, 1965, and the Quintanas rebuilt it with their own funds because it was not insured. In 1966, they purchased property owner's insurance from Tennessee Farmers Mutual Insurance Company ("Tennessee Farmers") through Harold Willis, an employee of the Coffee County Farm Bureau.

Mr. and Mrs. Quintana purchased other Tennessee Farmers insurance from Mr. Willis during the ensuing years, including their car insurance and several life insurance policies. Between 1966 and 1969, they had another fire loss to an outbuilding and a theft loss. They enlarged their home in 1984 and obtained a revised homeowner's policy with increased policy limits from another Tennessee Farmers agent at the Coffee County Farm Bureau.

The Quintanas' house was burglarized in June and again in August, 1986. Mr. and Mrs. Quintana filed insurance claims, and Tennessee Farmers paid for the losses. However, unbeknownst to the Quintanas or Mr. Willis, the multiple theft claims prompted Tennessee Farmers' underwriting department to review the Quintanas' file to determine whether the company would continue to insure the Quintanas' house.

The Quintanas placed their farm up for sale in late 1986. They also decided to visit their son who was a military recruiter stationed near Houston, Texas. They left their son's name and telephone number with their realtor in case a buyer made an offer on the farm. On November 5, 1986, while at the farm bureau office on other business, Mr. Quintana mentioned to Mr. Willis that he was on his way to Texas to visit his son and that he would be leaving in a few days. Mr. and Mrs. Quintana left home on November 10, 1986.

Meanwhile, Tennessee Farmers' property underwriting manager decided to cancel the Quintanas' property insurance. On November 5, 1986, he prepared two letters notifying the Quintanas that their policy had been cancelled and sending them a $116 check refunding the unearned premium. Tennessee Farmers mailed the letters from Columbia by registered mail to the Quintanas' home address on November 10, 1986 and sent Mr. Willis copies.

Mr. and Mrs. Quintana were not home when the letters arrived, and the post office did not forward them because the Quintanas had left instructions to hold

rather than forward their mail. Mr. Willis did not attempt to contact the Quintanas when he received his copy of the cancellation notice. While he was aware that the Quintanas were travelling and that their son was in the service, he did not know their son's name, address or telephone number and did not know when the Quintanas planned to return to Tennessee.

An arson fire damaged the Quintanas' house on December 27, 1986. The Quintanas' real estate agent called them at their son's home in Texas with the news. Cutting their visit short, they returned to Tennessee on December 30, 1986 and discovered that Tennessee Farmers had cancelled their insurance when they picked up their mail. Mr. Quintana sought out Mr. Willis who told him that "it looks like everything had been cancelled."

Mr. and Mrs. Quintana consulted a lawyer. On January 2, 1987, they endorsed and cashed Tennessee Farmers' premium refund check. Later, on April 30, 1987, they sued Tennessee Farmers alleging that the company had "never notified [them] that the policy had been cancelled and had never returned ... any refund on their premium." The trial court conducted a bench trial in May, 1988 and on July 29, 1988 entered an order in which it found that Tennessee Farmers' attempted cancellation of its policy had not been effective because it had not given the Quintanas the "requisite ten days advance notice" and because the Quintanas did not receive actual notice of the policy's cancellation.

## II.

Tennessee Farmers' obligations to the Quintanas are based upon the terms of its policy. With regard to cancellation and the refund of unearned premiums, the general policy conditions provide:

**Cancellation**

**Your Right To Cancel**

**You** may cancel this policy by returning it to **us** or by advising **us** in writing when at a future date the cancellation is to be effective.

**Our Right To Cancel**

**We** may cancel by giving notice of cancellation to **you**, at the address shown in the Declarations not less than 10 days prior to the effective date of cancellation. Proof of mailing will be sufficient proof of giving notice.

**Return Of Premium**

If **you** or **we** cancel **your** policy, **we** will return no more than the pro-rated unused share of **your** premium.

Insurance policies are subject to the same rules of enforcement and construction that apply generally to contracts. *Great Am. Life Ins. Co. v. Armstrong*, 182 Tenn. 181, 187, 185 S.W.2d 505, 507 (1945). Thus, courts must construe insurance policies fairly and reasonably, *Dixon v. Gunter*, 636 S.W.2d 437, 441 (Tenn.Ct.App. 1982), and must give their language its usual and ordinary meaning. *Parker v. Provident Life & Accident Ins. Co.*, 582 S.W.2d 380, 383 (Tenn.1979); *Metropolitan Life Ins. Co. v. Smith*, 554 S.W.2d 123, 128 n. 4 (Tenn.1977).

The courts should not favor either party if the policy's language is unambiguous and free from doubt, *Winecoff v. Nationwide Mut. Ins. Co.*, 223 Tenn. 267, 273, 444 S.W.2d 84, 86–87 (1969); *In re Clement's Estate*, 220 Tenn. 114, 118, 414 S.W.2d 644, 646 (1967); *Wallace v. State Farm Mut. Ins. Co.*, 187 Tenn. 692, 701, 216 S.W.2d 697, 701 (1949), and should enforce unambiguous policies as written. *Pacific Mut. Ins. Co. v. Walt*, 198 Tenn. 59, 62, 277 S.W.2d 434, 436 (1955); *Inman v. Life & Casualty Ins. Co.*, 164 Tenn. 12, 16, 45 S.W.2d 1073, 1074 (1932).

The courts are likewise not free to rewrite an insurance policy simply because they do not favor its terms. *See Memphis Mfg. Co. v. American Casualty Co.*, 480 S.W.2d 531, 533 (Tenn.1972); *Mutual Benefit Health & Accident Ass'n v. Dixon*, 27 Tenn.App. 312, 318, 180 S.W.2d 426, 428 (1944); *Berry v. Prudential Ins. Co. of Am.*, 23 Tenn.App. 485, 490, 134 S.W.2d 886, 889–90 (1939). In the absence of fraud, overreaching, or unconscionability, the courts must give effect to a policy if its language is clear and its intent certain.

### III.

We find that Tennessee Farmers' cancellation clause is plain and unambiguous. It provides that Tennessee Farmers may effectively cancel its policy by mailing a notice of cancellation to the policyholder at the address shown in the declarations portion of the policy at least ten days prior to the effective date of the cancellation. The policy does not require that the insured receive the notice in order for the cancellation to be effective. Thus, the trial court erred by refusing to give effect to Tennessee Farmers' cancellation notice on the grounds that the Quintanas did not receive actual notice that their policy was cancelled.

Cancellation clauses such as the one involved in this case are not against public policy. 17 G. Couch, *Cyclopedia of Insurance Law* § 67:183 (rev. 2d ed. 1983). A majority of the courts construing similar clauses have held that the insured need not actually receive the notice in order for the cancellation to be effective. *Har–Con Corp. v. Aetna Casualty & Sur. Co.,* 757 S.W.2d 153, 154 (Tex.Ct.App.1988); *Government Employees Ins. Co. v. Superior Court,* 27 Ariz.App. 219, 553 P.2d 672, 673 (1976); *see also* 17 G. Couch, *Cyclopedia of Insurance Law* § 67:182 (rev. 2d ed. 1983); 6A J. Appleman & J. Appleman, *Insurance Law and Practice* § 4186, at 552 (rev. ed. 1972); Annotation, *Actual Receipt of Cancellation Notice Mailes by Insurer As Prerequisite To Cancellation of Insurance,* 40 A.L.R. 4th 867 § 6[a] (1985).

Tennessee's courts have aligned themselves with the majority rule. *Calvert Fire Ins. Co. v. American Nat'l Bank & Trust Co.,* 222 Tenn. 515, 518, 438 S.W.2d 545, 546 (1969); *Cherokee Ins. Co. v. Hardin,* 202 Tenn. 110, 116–18, 302 S.W.2d 817, 820 (1957); *State Auto. Mut. Ins. Co. v. Lloyd,* 54 Tenn.App. 587, 610, 393 S.W.2d 17, 27 (1965).

Tennessee Farmers must prove that it complied strictly with the policy's requirements in order to take advantage of the cancellation by mail provision. *State Auto. Mut. Ins. Co. v. Lloyd,* 54 Tenn.App. at 607, 393 S.W.2d at 26. We find that Tennessee Farmers has carried its burden in this case. Its notice identified the policy and stated unequivocally that the policy had been cancelled. It was addressed to Mr. Quintana at his correct address and was accompanied by a refund of the unearned premium. It was duly mailed, and the post office delivered the letter to the Quintanas' post office box in Wartrace, Tennessee. Even the Quintanas do not dispute that they would have received the letter shortly after it was mailed had they been at home or had they requested the post office to forward their mail.

In the final analysis, the Quintanas' case is based on their belief that they were entitled to better treatment by their insurance company. They insist that Tennessee Farmers should bear the risk that its policyholders might not read their mail. They also insist that their long association with Mr. Willis gave rise to a duty on his part to notify them of the cancellation because he knew they were out of town. While we sympathize with the Quintanas, we do not agree that the law places these responsibilities on insurance companies or their agents under the facts of this case.

The cancellation clause itself allocated the risk in favor of Tennessee Farmers by providing that the notice of cancellation would be effective ten days after it was mailed to the insured at the address listed in the policy. The parties agreed to this provision, and therefore, this Court would, in effect, be rewriting the contract if we were to shift the burden back to the insurance company. The Quintanas must bear the burden of their decision to ask the post office to hold their mail instead of having it forwarded to Texas. On similar facts, the Florida District Court of Appeals found that a notice mailed to an insured's home address was sufficient even though the insured did not receive the notice because she had instructed the post office to hold her mail while she was visiting in another state. *Foerch v. Atlantic Mut. Fire Ins. Co.,* 303 So.2d 345, 346–47 (Fla.Dist.Ct.App. 1974), *cert. dismissed,* 324 So.2d 633 (Fla. 1975).

The Quintanas' long business relationship with Mr. Willis did not require him to notify them of the policy's cancellation. In the absence of an agreement creating continuing responsibilities, an insurance agent's obligation to a client ends when the agent obtains the insurance for the client. *See* 1 B. Harnett, *Responsibilities of Insurance Agents & Brokers* § 3.13, at 3–131 (1989). Thus, an agent has no duty to inform a client of a policy's cancellation if the client knew or should have known of the cancellation by other means. *Honeycutt v. Kendall*, 549 F.Supp. 802, 805 (D.Del.1982).

Mr. Willis knew that Tennessee Farmers was contractually obligated to notify the Quintanas directly if it cancelled their insurance. He also knew that Tennessee Farmers had notified the Quintanas that it had cancelled their insurance because he received copies of the cancellation letters. While he knew that the Quintanas had decided to visit their son, he did not know how long they would be gone or whether they had made arrangements to forward their mail. He had no express or implied agreement with the Quintanas to contact them if Tennessee Farmers cancelled their insurance. Therefore, he did not have a duty to try to contact the Quintanas when he received his copies of the cancellation letters.[1]

Finally, the discrepancy between the date of the cancellation letter and the date of its mailing does not provide grounds to invalidate the notice of cancellation. Contrary to the trial court's finding, Tennessee Farmers' notice did not purport to circumvent the ten-day notice requirement by cancelling the policy effective on November 5, 1986. The notice simply cancelled the coverage "in accordance with the provisions of the policy contract." This language necessarily implies that the cancellation would not be effective until ten days after it had been mailed. This issue might have assumed more significance if the loss had occurred between November 15 and November 20, 1986. However, the loss occurred on December 27, 1986—long after any conceivable ten-day notice period would have expired.

### IV.

We reverse the trial court's judgment and remand the case for the entry of an order dismissing the Quintanas' complaint against Tennessee Farmers Mutual Insurance Company. The costs of the appeal are taxed to John and Ida Quintana and their sureties for which execution, if necessary, may issue.

TODD, P.J., and CANTRELL, J., concur.

---

1. At one point, the Quintanas implied that Mr. Willis knew where they were and that he purposely decided not to contact them concerning the cancellation. There is no evidence to support this. Mr. Quintana concedes that he did not give his son's name, address and telephone number to Mr. Willis during their November 5, 1986 conversation and that he did not tell Mr. Willis how long they would be away from home. His assumption that Mr. Willis was familiar with their travel plans does not provide a sufficient basis to impute to Mr. Willis the knowledge of the Quintanas' whereabouts.