IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 20, 2004 Session

# DAVID BLURTON AND WIFE, VIRGINIA BLURTON
v.
# GRANGE INSURANCE & CASUALTY COMPANY

**An Appeal from the Chancery Court for Haywood County**
**No. 11255      George R. Ellis, Chancellor**

_____

**No. W2003-01177-COA-R3-CV - Filed July 2, 2004**

_____

This is a declaratory judgment action to establish coverage under an insurance policy. The plaintiffs' home was insured by a homeowners policy with the defendant insurance company. The insurance company canceled the policy for nonpayment of the premium and claimed that it mailed a notice of cancellation to the insureds at that time. Six months later, the plaintiffs' home was damaged by fire, and they filed a claim on their policy. The insurance company denied the claim. The plaintiffs filed this lawsuit to recover on the policy, asserting that they never received the cancellation notice, and that the insurance company did not properly cancel the policy. At trial, the insurance company representative testified about the company's customary routine of sending cancellation notices, and it was undisputed that the insurance agent and the mortgagees received notices. The trial court held in favor of the plaintiffs based on, among other things, its determination that the insurance company did not prove that it had mailed a cancellation notice to the plaintiffs. The insurance company now appeals. We reverse, finding that the evidence preponderates in favor of a finding that the cancellation notice was mailed to the plaintiffs.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Robert O. Binkley, Jr., and Latosha Mason Dexter, Jackson, Tennessee, for the appellant, Grange Insurance & Casualty Company.

William L. Hendricks, Jr., Memphis, Tennessee, for the appellees, David Blurton and wife, Virginia Blurton.

# OPINION

Plaintiffs/Appellees David Blurton and his wife, Virginia Blurton (collectively "Blurtons"), owned a home at 793 Allen Station Road in Brownsville, Tennessee. Effective June 1990, the Defendant/Appellant Grange Insurance & Casualty Company ("Grange") provided homeowners insurance coverage for the Blurtons' Allen Station Road home. The Blurtons renewed the policy for one-year periods, beginning on June 6, 1991, 1992, 1992, and 1993. Each time, the Blurtons elected to pay the premiums in five installments.

In June 1994, the Blurtons received a renewal and premium notice from Grange. At that time, the Blurtons again chose to pay the 1994 premiums in five installments. The first installment was due sometime in June 1994, and the others were due on August 5, October 4, December 3, 1994, and on February 1, 1995. The Blurtons wrote a check for the June 1994 installment in a timely manner, and the payment of that installment was acknowledged by Grange.

On July 11, 1994, Grange sent a premium notice to the Blurtons for the August 5 payment. That premium notice listed the entire installment schedule, indicating the due dates on which the three remaining installments would be due for the policy. Grange sent no further premium notices.

The Blurtons wrote a check for the second installment on August 10, 1994, check number 8659 from the bank account of Southern Industrial Mechanical Maintenance Company ("SIMMCO"), owned by the Blurtons.[1] A copy of the check was submitted as an exhibit at trial, but the check copied was not signed. The Blurtons claimed that the check was mailed to Grange, but Grange maintained that it never received the check. The check never cleared SIMMCO's bank account. Though the Blurtons were aware of this fact, they did not discover why the check had never cleared.

Grange contends that, on August 16, 1994, its automated system generated a cancellation notice to the Blurtons, which was scheduled to be mailed on August 17, 1994. The notice stated that the Blurtons' homeowners policy would be canceled for nonpayment at 12:01 a.m. on August 29, 1994. A copy of that notice was sent to the Blurtons' insurance agent, William Freeman ("Freeman"). On August 29, 1994, Grange issued a final notice of cancellation to the Blurtons, stating that the policy was canceled as of 12:01 a.m. on that day. A copy of the final notice was sent to Freeman as well as the first and second mortgagees on the property. The Blurtons would later claim that they did not receive either of the cancellation notices sent by Grange. It is undisputed that Grange did not send the Burtons any more invoices for installment payments of premiums, and that the Burtons in fact made no further payments under the installment plan for the homeowners policy. Ultimately, the Blurtons apparently assumed that their June 6, 1994 policy was still in effect, but Grange considered the policy to have been canceled as of August 29, 1994.

---

[1]The records of SIMMCO reflect that the payment was for personal use, rather than a business use.

On February 25, 1995, six months after Grange canceled the Burtons' insurance policy, the Blurtons' home caught on fire. When the Blurtons called agent Freeman the following day, he informed them that their homeowners policy had been canceled, and that, consequently, their loss was not insured. The Blurtons claimed that this was the first time that they learned of the policy cancellation.

On February 23, 1996, the Blurtons filed the instant declaratory judgment action in the trial court below, arguing that they were entitled to recover for the fire loss under their homeowners insurance policy. The Blurtons alleged that Grange did not follow the cancellation procedures outlined in the insurance policy and that, consequently, its attempt to cancel the policy was ineffective. The original complaint named the insurance agent Freeman as a defendant, claiming that Freeman had a duty to notify the Blurtons of the cancellation of their policy when he received the initial notice of cancellation from Grange, and that this duty was breached. Freeman filed a motion for summary judgment, which was granted on November 10, 1998.

The matter proceeded to a bench trial on three separate days: December 12, 2000, April 5, 2001, and August 1, 2001. The majority of Grange's proof at trial regarding the cancellation of the Blurton's policy was submitted through the testimony of Earl Blair ("Blair"), Grange's assistant vice president of process accounting. Blair testified that he was in charge of receiving premiums and issuing cancellation notices if premiums were not paid. He explained that, if Grange does not receive a premium payment on a policy, the company's computer system automatically generates a notice of cancellation to the insured. In preparation for his testimony regarding the Blurtons, Blair stated, he obtained the computer records for the Blurtons' account. He submitted the agent's copy of the August 16 cancellation notice and the August 29 final notice, both generated through the automated system. The first notice was sent to the Blurtons and Freeman, Blair said, and the final notice was sent to the Blurtons, Freeman, and the first and second mortgagees. The final notice to the mortgagees included a grace period, giving the mortgagees thirteen days from the date of the notice to protect their interest.

Blair described the automated process in some detail. He stated that, after a notice of cancellation is generated, it is delivered to the mail room at night. The next morning, the mail is put into inserters, which folds the mail, put the mail in window envelopes, and put postage on the envelopes. The letters are then put in mail trays, from which the postal service picks them up for mailing. Blair explained that the computer system keeps track of the number of notices it generates, and that the inserters keep track of how many notices are inserted. If the numbers do not match, Blair is notified that a problem exists. On the days that the notices to the Blurtons were generated, Blair was not notified of a problem, so he assumed that the notices were sent in due course. Blair testified that the envelopes in which the notices are sent contained a correct return address, and that he received no returned mail intended for the Blurtons. Blair testified that, under Grange's automated system, all of the notices for one insured are generated at the same time. In this case, Blair stated, if agent Freeman and the mortgagees received their notices, then the Blurtons should also have received their notices, because their proper address was on the notices. Blair admitted that the computer system could not reproduce a copy of the Blurtons' August 29 final notice, but

-3-

maintained that the notice contained the same language as the mortgagees' notices, minus the additional clause directed specifically to the mortgagees.

Mrs. Blurton testified that she did not receive either of the notices sent by Grange. She acknowledged, however, that on other occasions she had received correspondence from Grange, including two prior notices of cancellation. Mrs. Blurton testified that she handled the financial aspects of SIMMCO, owned by her and Mr. Blurton. She said that she and one of SIMMCO's employees, Martha Sharp ("Sharp"), worked together on accounts payable, and indicated that Sharp actually wrote check number 8659 to Grange for the insurance premium. The Blurtons introduced into evidence SIMMCO's check register, kept in the ordinary course of business, showing that check number 8659 was written to Grange on August 10, 1994, for the insurance premium. Mrs. Blurton testified that the check was copied before it was signed and mailed, and that she did not know what happened to the check.

The insurance agent, William Freeman, also testified. Freeman said that he received copies of both the first notice of cancellation and the final notice within three to five days after they were issued. Freeman testified that, after the fire, the Blurtons called him asking about insurance coverage. Upon further investigation, Freeman discovered that the policy had been cancelled for nonpayment, and informed the Blurtons of that fact. When he asked Mr. Blurton what may have happened regarding the payment, Mr. Blurton's response was that "an employee failed to pay it." Freeman testified that he was aware that Mrs. Blurton had had a discussion with his co-worker, Anita Miller, indicating that Mrs. Blurton felt that she could obtain insurance somewhere else for a cheaper premium. When Freeman received his copy of the cancellation notices for the Blurton policy, he recalled that conversation, and accordingly he assumed that the Blurtons had procured insurance elsewhere. When asked why he assumed that the Blurtons had received their cancellation notices, Freeman responded that he knew that Grange was obligated under the policy to send cancellation notices to its insureds. Because he had received copies, and because he was aware that all of the notices are produced at the same time under the computer system, Freeman assumed the Blurtons' notices were also mailed.

On December 18, 2002, the trial court entered an order finding in favor of the Blurtons. The trial court concluded that Grange had not properly canceled the insurance policy, and that, therefore, the company was liable to the Blurtons for the stipulated amount of damages, $270,000 plus prejudgment interest. The trial court based its decision on its conclusion that Grange "did not provide any evidence that the [cancellation] notice was mailed." The trial court found that Blair's testimony on the mailing was insufficient, because Blair had no "direct personal knowledge that any of the notices in question in this case were mailed to the Blurtons," nor was he able to testify about any Grange employee who personally handled the notices. In determining that Blair's testimony was insufficient to show proof of mailing, the trial court reasoned:

> Mr. Blair was not employed by the Grange in the department that dealt with the mailing of notices of cancellation, and Mr. Blair had no personal knowledge that any of the involved cancellation notices were mailed to the Blurtons. Mr. Blair had

no oversight of the mail room at the Grange where some 22,000 to 30,000 documents come in and go out on a daily basis. Mr. Blair could not testify as to which employee of the Grange, if any, mailed out any notice to the Blurtons. Mr. Blair could not present documentation and there is no documentation, that postage was in fact placed on the supposed notices to the Blurtons. The Grange kept no log as to the documents sent out. The Grange had no documentation to demonstrate who in the Grange's mail room may or may not have handled the documents in question. Mr. Blair could present no documentation that showed any reconciliation in the mail room of the number of letters printed in a day and the number of stamps placed on letters. Mr. Blair had no direct personal knowledge that any of the notices in question in this case were mailed to the Blurtons. Also, Mr. Blair testified that it was impossible to produce any documentation showing that a mailing of the supposed notices of cancellation went out to the Blurtons. The August 29, 1994, final notice of cancellation showed copies to the agent, the mortgagee and the second mortgagee, but it does not show a copy to the insured.

Mr. Blair testified that he had no direct personal knowledge that the notices at issue in this case were handled in the usual course of business. In fact, Mr. Blair presented no tangible evidence or company documentation that the notices were sent at all. There was no evidence presented by the Grange that demonstrates proper mailing or delivery of the notices to the post office such that the Grange could benefit from any presumption of mailing. The undisputed proof was that the Blurtons never received the notices from the Grange that are the pivotal subject matter of this lawsuit.

Thus, the trial court held that the evidence was insufficient to show that Grange had in fact mailed the cancellation notices. The trial court found, therefore, that Grange did not properly cancel coverage pursuant to the terms of the policy. In the alternative, the trial court found that, even if Grange had mailed the notices to the Blurtons, it still did not properly cancel the policy, because it did not give the mortgagees ten days notice of the cancellation, as is required under the terms of the contract. In addition, the trial court made a factual finding that the Blurtons paid their August 1994 premium by mailing check number 8659 to Grange. The trial court inferred that, because the payment was effective when mailed, Grange had no basis on which to cancel the Blurtons' insurance policy. Finally, the trial court determined that Grange was estopped from canceling the Blurtons' insurance policy, because Freeman had a duty to notify the Blurtons of the cancellation and failed to do so.

On January 14, 2003, Grange filed a motion to alter or amend the judgment, requesting that the Blurtons' Chapter 7 bankruptcy trustee be substituted as the plaintiff, because the trustee was the real party in interest based on the Blurtons' 1999 Chapter 7 bankruptcy filing. Grange further requested that prejudgment interest, if any, be limited to a rate of not more than six percent (6%) for

a period of one year. On April 24, 2003, the court entered an order on Grange's motion, substituting the Chapter 7 trustee as the plaintiff, and ordering prejudgment interest at a rate of ten percent (10%) from February 26, 1996, through August 1, 2001. From that order, Grange now appeals.

On appeal, Grange argues that the trial court erred in concluding that the Blurtons' homeowners policy was not properly canceled. Grange maintains that its policy does not require it to produce a post office "proof of mailing." Under the terms of the policy, it contends, cancellation by sending a notice in the mail is sufficient unless a post office proof of mailing is required by law. Therefore, the evidence at trial showed, by a preponderance of the evidence, that Grange mailed the cancellation notices to the Blurtons and, thus, properly canceled the policy. Grange argues further that the trial court's three alternative bases for holding in favor of the Blurtons were erroneous because (1) notice to the mortgagee is solely to protect the mortgagee's interest, not the interest of the insured; (2) the evidence preponderates against a finding that the Blurtons made the August 1994 payment; and (3) Freeman had no duty to contact the insured when he received his copy of the cancellation notice from Grange. In the alternative, Grange argues, even if the trial court's decision against Grange is upheld, prejudgment interest should not have been awarded for the period of time between the Blurtons' bankruptcy filing (June 1999) and the time the trustee undertook to pursue the claim (June 2000), because Grange should not be penalized for the bankruptcy trustee's delay.

Because this case was decided by the trial court without a jury, we review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the preponderance of the evidence is otherwise. *Tennessee Farmers Mut. Ins. Co. v. Moore*, 958 S.W.2d 759, 763 (Tenn. Ct. App. 1997); Tenn. R. App. P. 13(d). The trial court's conclusions of law are reviewed *de novo*, with no such presumption of correctness. *Moore*, 958 S.W.2d at 763; *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

Insurance contracts are subject to the same rules of construction as any other contract. *Moore*, 958 S.W.2d at 763. The plain language of the policy should be given its ordinary meaning, and the parties' intent is paramount. *Id.*; *see also Allstate Ins. Co. v. Wilson*, 856 S.W.2d 706, 709 (Tenn. Ct. App. 1992). The policy should be interpreted fairly and reasonably, giving the language of the policy its common, ordinary meaning. *Black v. Aetna Ins. Co.*, 909 S.W.2d 1, 3 (Tenn. Ct. App. 1995). Any ambiguity in the policy should be construed against the party who drafted it, the insurance company. *Moore*, 958 S.W.2d at 763. When an insurer wishes to rely upon the cancellation of a policy by mailing a notice of cancellation, it must show that "it complied strictly with the policy's requirements." *Quintana v. Tennessee Farmers Mut. Ins. Co.*, 774 S.W.2d 630, 633 (Tenn. Ct. App. 1989); *see Calvert Fire Ins. Co. v. American Nat'l Bank & Trust Co.*, 438 S.W.2d 545, 546 (Tenn. 1969). Strict compliance is required so that the insured will have time to obtain other insurance or protection. *Jefferson Ins. Co. of New York v. Curle*, 771 S.W.2d 424, 425-26 (Tenn. Ct. App. 1989).

In the homeowners policy at issue in this case, the cancellation provision reads as follows:

2.      Cancellation

   (a)      Your Right to Cancel
   You may cancel this policy by returning it to us or by advising us in writing when at a future date the cancellation is to be effective.

   (b)      Our Right to Cancel or Refuse to Renew
   We may cancel this policy only for the reasons stated below **by mailing notice of cancellation to you**, and to any lienholder named in the policy at the address shown in the Declarations, or by delivering the notice to you.

      (1)      We may cancel this policy at any time with only 10 days notice before the effective date of cancellation if you have not paid the premium payable to us, to our agent or under any finance plan.

***

   **The mailing of notice, or proof of mailing when required by law, will be sufficient proof of notice.**  The policy period will end on the date and time stated in the notice.

(Emphasis added).  Under the plain terms of the policy at issue, Grange was entitled to cancel the policy at issue "by mailing notice of cancellation" to the Blurtons.  The policy does not include a requirement that Grange produce a post office proof of mailing, such as a return receipt or certificate, in order to prove that such notice had been mailed.  Such proof was not required by the contract, nor is it required under Tennessee law.  ***See Stooksbury v. Am. Nat. Prop. & Cas. Co.***, 126 S.W.3d 505, 516-17 (Tenn. Ct. App. 2003) (recognizing that Tennessee law does not require that cancellation notices be sent via certified mail, and stating that such a requirement "is a matter better left to the Tennessee Legislature as opposed to the court system").

Moreover, Grange notes, it is not necessary that the Blurtons have actually received the notice of cancellation in order for it to be effective.  In support of its position, Grange cites the holding in ***Quintana v. Tenn. Farmers Mut. Ins. Co.***, 774 S.W.2d 630 (Tenn. Ct. App. 1989).  In ***Quintana***, the insurance company decided to cancel the insureds' property insurance due to the filing of multiple claims.  On November 10, 1986, the insurance company mailed a cancellation notice to the insureds by registered mail.  Coincidentally, on the same day, the insureds left home for several weeks to visit their son in Texas.  About six weeks later, while they were in Texas, their home was damaged by arson.  ***Quintana***, 774 S.W.2d at 631-32.  The insureds did not receive the cancellation notice sent by the insurance company until they returned from Texas after the fire, because they had

had their mail held rather than forwarded while they were away. The insureds filed a claim on the fire loss. The insurance company denied the claim, asserting that the policy had been cancelled. The insureds sued the insurance company for coverage under the policy as well as bad faith damages. The trial court held that the insurance company's attempted cancellation of the insureds' policy was ineffective, because the fact that the insureds did not get the mailed notice prevented them from receiving actual notice of the policy's cancellation. *Id.* at 632. On appeal, this Court reversed, concluding that "the insured need not actually receive the notice in order for the cancellation to be effective." *Id.* at 632-33; *see Calvert*, 438 S.W.2d at 545 (holding that, where the fact of mailing was undisputed, it is unnecessary that notice actually be received in order for the cancellation to be effective).

The policy in the instant case, like the policy in *Quintana*, does not require that the Blurtons receive actual notice of the cancellation. Under Tennessee law, it is clear that, unless the policy requires actual notice, an insured "need not actually receive the notice in order for the cancellation to be effective." *Quintana*, 774 S.W.2d at 633. In the instant case, however, the trial court did not hold that the cancellation of the Blurtons' policy was ineffective based on the lack of actual notice. The trial court held that all of the evidence, when taken as a whole, did not show that Grange ever mailed the cancellation notices to the Blurtons. The issue, then, is whether the evidence as a whole preponderates in favor of a finding that the notice was actually mailed. In *Quintana*, it was undisputed that the insurance company mailed the cancellation notice to the insured. Therefore, the holding in *Quintana* is not determinative of the ultimate issue in this case.

Grange argues that the evidence as a whole preponderates against the trial court's finding that it did not mail a cancellation notice to the Blurtons. Grange argues the trial court erred in rejecting Blair's testimony as competent evidence of mailing through the usual and customary business routine of sending out cancellation notices at Grange, and that the trial court erroneously required testimony from the person accustomed to taking the mail to the post office to prove that the Blurtons' notice was mailed. It asserts that Blair was thoroughly familiar with the business custom at Grange, and that Grange had followed the same procedures for thirty-four years. Grange argues that Blair explained in detail the procedures followed on August 16 and 17, 1994, and then on August 29 and 30, 1994, that would indicate that the cancellation notices were mailed to the Blurtons in the due course of business. The evidence also showed, Grange points out, that all other mailings from Grange consistently reached the Blurtons at their Allen Station Road address. Furthermore, Freeman received copies of the August 16 and the August 29 notices, and the mortgagees received copies of the August 29 notice. Both Freeman and Blair testified that the notices were mailed to the agent and the insured simultaneously. Mrs. Blurton acknowledged that Grange had her correct mailing address, and that from 1990 to 1994, she had received every other document mailed to her from Grange, including two prior notices of cancellation. The only evidence to rebut Grange's evidence that the notices were mailed, argues Grange, is the Blurtons' denial of their receipt of the notices. Grange contends that the Blurtons' testimony on this issue is insufficient to overcome the evidence of mailing, because Mrs. Blurton's testimony was inconsistent at best.

In response, the Blurtons argue that the trial court was correct in concluding that the evidence was insufficient to show that the cancellation notice was properly mailed to them, because Tennessee law requires an insurance company to present evidence that notice was actually taken to the post office. In support of that argument, the Blurtons rely on *Cherokee Ins. Co. v. Hardin*, 302 S.W.2d 817 (Tenn. 1957). In *Cherokee*, the insurance company issued an automobile insurance policy on an automobile owned by the insureds. Sometime in 1955, the automobile was damaged, and the insureds filed a claim with the insurance company on the policy. The insurance company informed the insureds that the automobile policy had been canceled by a notice of cancellation that was mailed to them in June 1954. The insureds claimed that they did not receive the notice. They sued the insurance company for proceeds under the policy, taking the position that the notice of cancellation was never mailed to them. *Cherokee*, 302 S.W.2d at 818.

At trial, the insurance company introduced into evidence a carbon copy of the notice that was sent to the insureds, with an official post office receipt attached indicating that it had been received by the post office for mailing. The evidence showed that approximately twenty notices of a similar character were prepared by an insurance clerk and put in the outgoing desk mail basket each day. A porter would later pick up the letters, carry them to the post office for delivery, and procure the post office official acknowledgment for each letter for which a receipt was requested. *Id.* at 818-19. Despite that evidence, the jury found in favor of the insureds, determining that the cancellation notice had not been mailed. The verdict was approved by the trial court and upheld by the court of appeals. On appeal, the Supreme Court of Tennessee reversed the judgment entered on the verdict and found in favor of the insurance company. The *Cherokee* Court determined that, in the face of the conclusive post office proof of mailing, the insureds' denial of receipt of the notice did not "rise to the dignity" of material evidence sufficient to support the jury verdict. *See id.* at 818. The Court found the language of the policy, stating that "[t]he mailing of notice . . . shall be sufficient proof of notice," indicated that the determining factor was the mailing, not the receipt of the notice. *Id.* at 819.

In reaching its conclusion, the *Cherokee* Court found that it was unnecessary for the insurance company to present as a witness the person who took the mail to the post office, so long as there was evidence that the notice was taken there. The Court determined that evidence of the regular routine in a business office could satisfy that burden of proof. The Court in *Cherokee* quoted with approval the following passage from an Arizona case regarding evidence of mailing:

> It is the general rule in matters of this kind, where it is the custom of a business office to follow a regular routine, that where it is affirmatively established that part of a routine was followed it is presumed, in the absence of some evidence to the contrary, that the rest was also followed. [Citing cases] We think this is particularly applicable to matters such as the mailing of routine letters in an office where a very large number of such letters are customarily mailed in the due course of its business, and

that proof of the custom and the fact that a carbon copy was found without the original in the place and under the circumstances where it would have been found, if the original had been mailed, is sufficient, in the absence of evidence to the contrary, to support a finding that the original had been properly mailed.

*Id.* at 819 (quoting *Consolidated Motors v. Skousen*, 109 P.2d 41, 43 (Ariz. 1941)). Thus, in a business where a large number of letters are customarily mailed in a routine fashion, evidence of the custom of mailing, along with a copy of the letter kept in the records of the business, is sufficient to support a finding that the original was mailed.

The Blurtons also argue that the instant case is analogous to *Stooksbury v. American Nat. Prop. & Cas. Co.*, 126 S.W.3d 505 (Tenn. Ct. App. 2003), *perm. app. denied* (Jan. 26, 2004), in which the jury found in favor of the insureds on similar facts. In *Stooksbury*, the insureds' home was damaged by fire. When they attempted to recover for the resulting damage under their homeowners policy, the insurance company denied the claim, taking the position that the insurance policy had previously been canceled. The insureds sued the insurance company for coverage under the policy and for bad faith denial of their claim. *Stooksbury*, 126 S.W.3d at 507. At trial, the insurance company introduced the testimony of several witnesses to show that the cancellation notice was mailed in due course, including testimony from the insurance agent, an underwriting manager, a mail specialist, and the mail room supervisor. All of those witnesses testified as to the general practices and procedures for mailing cancellation notices, but none of them had personal knowledge about the mailing of the cancellation notice at issue. The insurance agent testified that he never received a copy of the cancellation notice. *Id.* at 509-10. In addition, the evidence indicated that the mortgagee did not receive the cancellation notice. *Id.* at 508. The insurance company also introduced evidence that, when it sends cancellation notices out, it creates a list of the insureds whose policies are being canceled, and that the mailing list is stamped by the post office when the notices are mailed. At trial, the insurance company identified a list that included the plaintiffs' names, and the list contained the post office round date stamp for the pertinent time period.

The jury held in favor of the insureds, concluding that the insurance company had not proven by a preponderance of the evidence that the notice of cancellation had been mailed to the insureds. *Id.* at 512. The jury also concluded that the insurance company's failure to pay for the insureds' loss was fraudulent and deceptive. On appeal, the insurance company argued, among other things, that the trial court erred in failing to grant it a directed verdict in light of the fact that there was no material evidence to support the jury's conclusion that it did not mail the notice of cancellation. The insurance company claimed that the circumstances were similar to the facts in *Cherokee*, *supra*, where the Supreme Court reversed the jury verdict in favor of the insureds. *Id.* at 516. The appellate court in *Stooksbury* disagreed and upheld the trial court's decision. The appellate court reasoned that the "round date stamp" was inconclusive proof of mailing, whereas the receipt attached to the carbon copy of the cancellation notice in *Cherokee* was conclusive proof of mailing. In light of that distinction, the *Stooksbury* court found that, "[i]n light of the non-conclusive effect of the 'round

date stamp' . . . coupled with other evidence such as Plaintiffs' testimony that they never received the notice of cancellation, we conclude there is material evidence in the record to support a verdict for Plaintiffs regarding whether or not the cancellation notice was mailed." *Id.*

In the case at bar, the Blurtons argue that, as in *Stooksbury*, the trial court below correctly found that the evidence did not support a finding that the cancellation notices at issue were mailed. They point out that Blair did not have any personal knowledge about the mailing of the notices, and that there was no documentary evidence, from the post office or otherwise, showing that the notices were mailed. They point out that Blair admitted that it was impossible to produce any conclusive documentation showing that the notices at issue were actually mailed to the Blurtons. Blair could present no reconciliation of the number of letters that were printed in a day and the amount of postage that was placed on those letters. Blair also acknowledged that Grange keeps no log of documents sent out. Therefore, the Blurtons argue, because of the lack of competent evidence showing that the cancellation notices were mailed, in addition to the Blurtons' testimony that they never received the notices, the evidence preponderates in favor of the trial court's conclusion that the notices at issue were not mailed to the Blurtons.

In this case, the policy provision at issue states that "[t]he mailing of notice . . . will be sufficient proof of notice." Therefore, Grange was required to produce evidence that it mailed the cancellation notices to the Blurtons.[2] The policy does not require post office proof of mailing. By this standard, we must evaluate the proof of mailing at trial.

Clearly, Blair was competent to testify about the customary routine at Grange regarding the mailing of cancellation notices. Blair was in charge of the entire department responsible for sending out such notices, and he demonstrated that he was intimately familiar with the automated process which had been in place at Grange for thirty-four years. Blair explained that notices of cancellation were generated automatically by the computer when premium payments went unpaid. Blair stated that a system was in place to alert him as to any irregularities in the process, and he testified that there were no irregularities on the dates on which the notices were sent to the Blurtons. He testified about the entire cancellation notice process, concluding with the notice being placed in a mail tray and picked up for mailing. Blair's testimony regarding the system at Grange was unrefuted. In *Cherokee*, the Court clearly stated that testimony from the person who mails the cancellation notice is not necessary to show a mailing, so long as there is evidence that the notice was taken to the post office. Such proof can be supplied by establishing a business routine, and showing that a document was mailed in the due course of business. *Cherokee*, 302 S.W.2d at 819. As the Court acknowledged in *Cherokee*, "in an office where a very large number of such letters are customarily mailed in the due course of its business," proof of custom can be sufficient to show that a document has been properly mailed. *Id.* (quoting *Skousen*, 109 P.2d at 43). The trial court in this case found that Blair's testimony was insufficient because he had no personal knowledge of the mailing of the Blurtons' cancellation notice. However, both *Cherokee* and *Stooksbury* show that the testimony of

---

[2]The Blurtons do not challenge the timeliness of the first notice, that is, whether a notice mailed on August 17, 1994, fell within the ten-day provision of the policy; rather, they challenge the fact that it was mailed.

-11-

one with personal knowledge of the mailing is not necessary to show that the cancellation notice was mailed in due course. *See* John P. Ludington, Annotation, *Proof of Mailing by Evidence of Business or Office Custom*, 45 A.L.R.4th 476, § 2 (1986) ("In large offices which handle a volume of mail, direct proof of the mailing of a particular letter is impractical – a fact that has been judicially recognized. In the modern age of business, it is almost inconceivable that one person would have a positive recollection of the mailing of a particular letter."). Overall, we must conclude that Blair's testimony was competent evidence that the notices of cancellation were mailed.

Other evidence corroborated Blair's testimony that the cancellation notices were mailed to the Blurtons. Both Blair and Freeman testified that the automated system generates the notices to the insurance agent and the insured simultaneously. Freeman stated that "[i]t comes off at the same time. The memorandum -- I mean the cancellation goes to any lienholder or mortgage holder, the agent's copy and the insured's copy all come off of most systems at the same time . . . ." It is undisputed that Freeman received his copies of both of the notices, and that the first and second mortgagees received copies of the second notice.[3] From these facts it can be inferred that the Blurtons' copy of the notices was mailed along with the notices to the Freemans and the mortgagees. Furthermore, it is undisputed that the Blurtons had received other documents previously mailed to them by Grange, including prior cancellation notices, to the same address. Blair's testimony that the notices generated to the Blurtons included a correct return address, and that the notices were never returned to Grange, was likewise unrefuted. The only evidence to support the Blurtons' claim that the cancellation notices were not mailed was the Blurtons' denial of receipt. Considering the evidence as a whole, although it is a close question, we must conclude that the evidence preponderates against the trial court's finding, and that the evidence in fact preponderates in favor of a finding that the cancellation notices were mailed to the Blurtons.

We readily acknowledge that the facts in this case are somewhat similar to those in *Stooksbury*, where the appellate court upheld the jury verdict in favor of the insureds when the primary evidence of nonmailing was the insureds' assertion that they did not receive the cancellation notice. The evidence in *Stooksbury*, however, also indicated that neither the insurance agent nor the mortgagee received the cancellation notice. Moreover, the scope of our review in this case is critically different from the standard applied in *Stooksbury*. The *Stooksbury* court was required to determine whether a jury verdict in favor of the insureds was supported by any material evidence. Under that standard of review, the appellate court "must take the strongest legitimate view of the evidence in favor of the plaintiff, indulging in all reasonable inferences in his favor, and disregarding any evidence to the contrary." *Stooksbury*, 126 S.W.3d at 516 (quoting *Wharton Transp. Corp. v. Bridges*, 606 S.W.2d 521, 525 (Tenn. 1980) (quoting *Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn. 1978))). The instant case, however, was tried before a judge sitting without a jury. In such a case, the trial court's findings of fact are reviewed *de novo* on the entire record, with a presumption of correctness. Under that standard, we do not view the evidence in the light most favorable to the trial

---

[3]Blair testified that under Grange's system, the mortgagees were not mailed copies of the first notice.

court's decision, and we do not disregard evidence contrary to its conclusion. Therefore, although the facts in *Stooksbury* are somewhat similar to those in the instant case, the same result is not required in light of the different standard of review.

In view of our holding that the trial court erred in finding that Grange had not shown that it mailed the notice of cancellation to the Blurtons, we must address the trial court's alternative holdings, which also favored the Blurtons. First, the trial court held that Grange did not properly cancel the Blurtons' policy because it did not send a copy of the first cancellation notice to the two lienholders as is required under the policy. As Grange correctly points out, however, requiring notice to a lienholder is for the protection of the lienholder, not the insured. *See Western Express, Inc. v. Interested Underwriters at Lloyd's, London*, 942 S.W.2d 542, 544 (Tenn. Ct. App. 1996). Therefore, regardless of whether the lienholders received the first notice, this does not mandate a finding in favor of the Blurtons.

In addition, the trial court determined that the Blurtons mailed their August 1994 insurance payment, and concluded from this that Grange was not entitled to cancel the Blurtons' insurance policy. Sharp testified that she wrote check number 8659 to Grange in payment of the homeowners premium, but Sharp also stated that she did not mail it. Sharp testified that Mrs. Blurton took the check to be signed, and then she gave it back to Sharp to mail. Mrs. Blurton testified that another office worker prepared the check just before she quit working for the Blurtons, and that the check sat in a folder for a week before anyone could pay it. Mrs. Blurton testified that she remembers having the check signed, and she produced an invoice containing her handwritten notation that she had paid the premium. A computer record from Grange was also submitted to indicate that the August 1994 premium was received on August 5, 1994, then it was debited on August 29, 1994, when the policy was canceled. The trial court concluded that this evidence showed that the Blurtons paid the premium on the policy. From our review of the record, however, this evidence is tenuous at best. The record also contains an unsigned copy of the premium check. The evidence is undisputed that, from the time that Mrs. Blurton allegedly mailed the check in August 1994 until February 1995, the premium check never cleared the Blurtons' bank account. The Grange computer record is inconclusive; Blair explained in his testimony that the alleged "payment" reflected on the document was an accounting entry that was necessary when a policy was canceled, and it did not indicate that the premium had been paid. It is undisputed that the check was not written until August 10, making it impossible for Grange to have received it on August 5, the date on the computer printout upon which the Blurtons rely. Under these circumstances, we must find that the evidence preponderates against the trial court's finding that the Blurtons made the August 1994 premium payment under the policy.

Finally, the trial court held that Grange was estopped from canceling the insurance policy at issue because the agent, Freeman, was obligated to notify the Blurtons of any cancellation. The trial court found that Freeman assumed such a duty through his course of dealing with the Blurtons. At the same time, however, Freeman was dismissed from the lawsuit. Furthermore, "an agent has no duty to inform a client of a policy's cancellation if the client knew or should have known of the cancellation by other means." *Quintana*, 774 S.W.2d at 634. Here, Freeman knew that Grange was

-13-

obligated to inform the Blurtons of a policy cancellation, and he assumed that Grange mailed a copy of the cancellation notices to the Blurtons when his were mailed. Freeman had no agreement with the Blurtons to contact them if Grange canceled their insurance policy. Moreover, Freeman's testimony was undisputed that the Blurtons had told him that they intended to seek less expensive insurance and he did not contact them in part based on his assumption that the cancellation notice meant they had done so. Under these circumstances, we must reverse the trial court's finding that Freeman assumed a duty to inform the Blurtons of the policy cancellation. *See id.*

In sum, we reverse the trial court's conclusion that Grange did not properly cancel the Blurtons' insurance policy. The evidence preponderates in favor of a finding that Grange mailed the cancellation notices to the Blurtons, and that the Blurtons did not make the August 1994 premium payment to Grange. In addition, lack of sufficient notice to the mortgagee does not protect the insured, and Grange is not estopped from canceling the policy based on Freeman's failure to inform the Blurtons of the cancellation notice. Our decision pretermits all other issues raised in this appeal.

The decision of the trial court is reversed. Costs on appeal are to be taxed to Appellees David Blurton and his wife, Virginia Blurton, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

-14-